FARRINGTON *et al.*, Respondents, v. MEEK *et al.*, Appellants.

1. Raftsmen engaged as such on the Mississippi river have, in the absence of any special limitations on their rights, a lien on rafts in their charge to secure the compensation due them as raftsmen.
2. Certain persons as raftsmen engaged at certain rates to run certain rafts from a point in the state of Wisconsin to any point on the Mississippi river between Dubuque and St. Louis that might be designated. The special agreement contained this further stipulation, that "the parties of the first part will furnish money enough to pay off the men within twenty-four hours after the delivery of the said lumber to market; the balance of the money to be paid after the lumber is sold and estimated or measured." *Held*, that the raftsmen had a lien upon the rafts for an amount sufficient to pay off at the point of distination the men employed by them; that the special contract overthrew the lien of the raftsmen only for so much of the contract price of transportation as exceeded the sum necessary to pay off the hands at the place of delivery.

*Error to St. Louis Circuit Court.*

This was an action to recover possession of two rafts of lumber alleged to be wrongfully detained by the defendants,

* See City of Lexington v. Aull, ante, p. 480.—[REP.

Meek and Clemens.  The plaintiff gave a delivery bond and took possession of the lumber.  The defendants in their answer admitted the ownership of the lumber by the plaintiffs, and set up a lien upon said lumber.  It appeared in evidence that in February, 1858, the plaintiffs, the owners of two rafts of lumber, engaged the defendant Meek and one Burns to run and raft said lumber from Wisconsin to any point designated by the owners in the Mississippi river between Dubuque and St. Louis, or to either of these places. For one raft they were to receive five dollars per thousand feet, and for the other five dollars and fifty cents per thousand feet.  The contract contained the following further provisions: "And it is further agreed by and between these presents that the parties of the first part will furnish money enough to pay off the men within twenty-four hours after the delivery of the said lumber to market; the balance of the money to be paid after the lumber is sold and estimated or measured; and the parties of the first part further agree to furnish money enough to get the said lumber over the rapids."

The arrival of the rafts at St. Louis was proven, and the refusal of the defendants to deliver them to plaintiffs.  The defendants offered evidence with a view to show that the plaintiffs had not paid, in accordance with the contract, money sufficient to pay off the hands employed on the rafts.

The court, at the instance of the plaintiffs, gave the following instruction: "If the jury believe from the evidence that the plaintiffs were the owners of the lumber in question about the twentieth of May, 1858, and continued to own it until the institution of this suit; that after the 20th of May and before the institution of this suit plaintiffs by their agent demanded said lumber of said defendants, and that at the time of such demand defendants were in possession of said lumber and refused to deliver the same to the plaintiffs or their agent, and detained the same from plaintiffs, they will find for the plaintiffs, and assess the damages at such sum

as they may believe from the evidence the plaintiffs lost by reason of defendants' detention of the lumber."

The court refused the following asked by defendants: " 1. If the jury believe from the evidence that the defendants were employed by the plaintiffs to raft and run the property sued for (consising of lumber) from the Big Eau Claire, in the state of Wisconsin, to the city of St. Louis, in the state of Missouri, at the rate of five dollars and twenty cents per thousand feet, and that the defendants complied with their contract, the plaintiffs can not recover the said property sued for, unless the price for bringing the same has been complied with by payment, by virtue of a lien subsisting thereon for work and labor done and performed in the bringing of said lumber to the city of St. Louis, and state of Missouri, at the price aforesaid mentioned. 2. If the jury believe from the evidence that the plaintiffs and defendants are all nonresidents of the state of Missouri, they can not recover in this action. 3. From the evidence introduced by plaintiffs they have failed to make out a cause of action."

The jury found for plaintiffs.

*D. C. Woods*, for appellants.

I. The defendants had a lien on the lumber. (7 East, 224; 6 East, 518; Jones on Bailm. 90; Story on Bail. 421; 2 Denio, 628; 3 Gilm. 233; 11 Shepl. 214, 439; 5 Metc. 166; 9 N. H. 66; 19 Pick. 228; R. Stat. of Wisconsin, p. 893.)

*Krum & Harding*, for respondents.

I. The defendants had no lien upon the lumber by virtue of having worked as raftsmen in bringing it from Wisconsin to St. Louis; nor by virtue of the written contract. No breach of the contract was alleged by defendants. If there had been, the only consequence would have been to give Meek and Burns an action against plaintiffs for damages. The testimony excluded was immaterial and incompetent. The action of the court in giving and refusing instructions was proper.

NAPTON, Judge, delivered the opinion of the court.

This action was brought by the owners of a raft of lumber to recover the possession of it from the raftsmen, who had brought it down the Mississippi from some point in Wisconsin, and who withheld it under a claim of a lien for a portion of the compensation agreed on for rafting. There was a special contract between the plaintiffs and defendants. By this contract the compensation was specified for managing the raft over various rapids and landing it at St. Louis, or some point on the Mississippi above St. Louis to be designated by the plaintiffs; and it was also provided that the own-ers of the lumber (the plaintiffs) should "furnish money enough to pay off the men within twenty-four hours after the delivery of the said lumber to market." The balance of the agreed compensation was to be paid when the lumber was sold or estimated and measured.

Upon the trial, proof was offered by the defendants that the plaintiffs did not advance, and refused to advance, money enough to pay off the men when the raft reached St. Louis— the point which the plaintiffs designated for its delivery. This evidence was not allowed to go to the jury, and the court instructed that there was no lien.

The case, then, presents the two questions, first, whether there is a specific lien in such bailments, in the absence of any contract; and secondly, if there is, was the special contract proved a waiver of it.

The precise limits to which the doctrine of specific liens has been extended by modern decisions can not be regarded as altogether settled. There is some disagreement as to the true foundation of the privilege; some ascribing it solely to the obligation which the common law imposed upon persons engaged in particular pursuits, such as common carriers, inn-keepers, and certain classes of tradesmen and artificers, to undertake any service in their line of business upon the demand of any one, however little might be known of his individual responsibility. The lien, in such cases, was given

to protect persons who were thus at the service of the public from imposition to which they would necessarily be subject in dealing with strangers. But a specific lien has been extended to many classes of artificers and bailees, who are not subjected to any such obligations as were supposed to attend these public employments we have alluded to. It is now conceded that a lien belongs to every bailee for hire, whose services have contributed to enhance the value of the property placed in his hands. The notion that certain pursuits partook so far of the character of public offices as to compel those engaged in them to accept every employment offered to them in the line of their business, if not entirely exploded, has at least long since become a mere abstract theory, and the principal basis of specific liens may be now regarded as resting upon the principle that the value of the property has been enhanced by the labor of the bailee.

It was held in England, and the decision appears to be still acquiesced in, that agisters are not entitled to a lien, upon the ground that no additional value was imparted to the animals by feeding them. Judge Gibson, of Pennsylvania, in Steinman v. Wilkins, 7 W. & S. 466, expressed doubts as to the propriety of these decisions, observing that " he was unable to see why a man, who fits an ox for the shambles by filling it with his provender, did not increase its intrinsic value." And Beavan v. Waters, Mood. & Walk. 235, where a trainer of a race-horse was allowed a lien, and Scarfe v. Morgan, 4 Mees. & Wel. 270, where a keeper of a stallion was allowed a lien on the mare for the price of the horse's service, were cited as instances in which the increased value of the bailment was allowed as a basis for the lien, and were not easily distinguished from the case of the agister.

The refusal to allow the agister a lien may be safely placed upon the same ground upon which it is denied to the keeper of a livery stable, that it is inconsistent with the very nature of the employment. Horses are taken to livery with an express understanding that they are to be given up to the owner whenever he has use for them. It is the same with

agisters; the right of access at all times on the part of the owner, and his right to put the cattle or horses to such uses as he has for them, is implied from the nature of the bailment, and is totally inconsistent with a right of detention on the part of the bailee. In the case of the agister, as well as the livery stable-keeper, the lien is impliedly abandoned by the contract; and these exceptions can not be regarded as detracting from the applicability of the general principle to cases where the nature of the contract does not forbid the retention of the lien.

It was at one time supposed that in order to lay the foundation for a specific lien, the *intrinsic* value of the bailment must be increased by mechanical means. But this idea seems to be abandoned in the English cases, to which we have referred, and it is clearly disavowed in the Pennsylvania case of Steinman v. Wilkins, where a warehouseman was held to be entitled to his lien. Neither the warehouseman, the wharfinger, nor the common carrier, adds any thing to the intrinsic value of the article. But a great change in the actual market value of an article may be and is effected by a change of place, brought about by the carrier, and the lapse of time during which the property has been preserved by the warehouseman. The concession of the lien to the wharfinger and warehouseman is also conclusive that it is not given solely because of any unusual and extraordinary responsibility incurred, such as falls upon common carriers and inn-keepers. It is well settled that no such responsibility attends the employment of warehousemen and wharfingers, but the lien is allowed them as well as common carriers and inn-keepers.

We have not found any allusion to the business of raftsmen of logs or lumber contained in the elementary works or adjudged cases on this subject. We can only apply the principles we understand to be settled in reference to analogous employments. The raftsmen are not common carriers, but they are private carriers for hire. The fact that the materials transported require no vessel or craft to be interposed

between them and the element on which they are floated, can not, we suppose, distinguish the employment of raftsmen from that of other carriers by water, so far as the present question is concerned. That their skill and labor has added vastly to the value of the lumber, by transporting it from the forests of Minnesota to the market of a populous city, is obvious, although the lumber remains intrinsically the same in shape and size and quantity as it was at the mills from which it was started. Every consideration of justice and policy would seem to authorize the application of the general principle to such employments.

It is well settled that the existence of a special contract does not of itself discharge a lien. The contract must be examined, and if it expressly or impliedly waives the lien, there is, of course, an end to the question. Where, for instance, the payment of the price of the service is stipulated to be made at a date subsequent to the delivery of the property, upon which the labor has been expended, there can, of course, be no lien.

The contract in the present case undoubtedly repels all idea of a lien for so much of the contract price, or cost of transportation, as exceeded the sum necessary to pay off the hands at the place of delivery. But the plaintiffs agree to furnish money enough " to pay off the men (employed on the raft) within twenty-four hours after the delivery of the said lumber to market." If this expression is to be understood as meaning a delivery of the raft to its owners, there could then be no lien retained, as it is stipulated to precede the payment by twenty-four hours. But we do not understand the word " delivery" to be used in this strict sense, and to give it such a construction is to defeat the main purpose of the clause. The words " delivery to market" mean " arrival at the place of destination." When this point was reached by the raft, the owners were allowed twenty-four hours within which to furnish so much of the contract price of transportation as would enable the contractors to pay off the subordinate employees. The implication is very strong

that, until this much at least was paid, there was no abandonment of the right of detention. The object of such a stipulation is manifest. A number of men must necessarily be turned loose without any certain employment, at a distance of hundreds of miles from home; and it was necessary that they should be furnished at least with the means sufficient to provide for their return. Why stipulate for the prompt payment of this sum and allow only twenty-four hours for its performance, if its non-performance is to be construed as a mere breach of contract, laying the foundation of a future suit for damages? Such a construction defeats all the purposes in view. It puts the agreement respecting the advance payment on the same footing with the agreement for the balance due, and thereby totally fails to secure the objects evidently in view. It leaves to the result of a long litigation to secure what was evidently designed to be prompt payment, to be coerced by a retention of the property, without awaiting the tedious process of a law suit.

We think the court should not have excluded the evidence offered, that the plaintiff refused to advance sufficient money to pay off hands, and that the plaintiffs had no right to recover possession of the raft until they had complied with their contract in this respect.

Judgment reversed and cause remanded.

Scott, Judge, dissenting. I am not prepared to say that a raftsman has a lien for his services on the lumber rafted. The conduct of the parties show here that the lien was waived if any existed.